No. 3:26-cv-02590-JD

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

---

IN RE: SF OAKLAND BAY LLC,

*Debtor-in-Possession.*

SF OAKLAND BAY LLC,

*Appellant*,

v.

PORTSIDE HOMEOWNERS' ASSOCIATION,

*Appellee(s)*.

On Appeal from the United States Bankruptcy Court
for the Northern District of California
Bankr. No. 25-30699-HLB
Hon. Bankruptcy Judge Hannah L. Blumenstiel

---

## APPELLANT'S OPENING BRIEF

---

Stephen D. Finestone (125675)
Michael J. Coffino (88109)
FINESTONE HAYES LLP
456 Montgomery Street, Suite 1300
San Francisco, CA 94104
(415) 421-2624
sfinestone@fhlawllp.com
mcoffino@fhlawllp.com
*Attorneys for Appellant,*
SF OAKLAND BAY LLC

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    STANDARD OF REVIEW ....................................................................3

III.   MATERIAL CONTRACT TERMS .......................................................3

IV.    PROCEDURAL HISTORY....................................................................7

V.     THE ORDER ..........................................................................................8

VI.    GOVERNING LICENSE LAW ...........................................................11

VII.   APPLICABLE CONTRACT INTERPRETATION PRINCIPLES ..............12

VIII.  LEGAL ARGUMENT..........................................................................14

       A.   The Contract Language Confirms the Grant of a License ..................14

       B.   The Contract Language Aligns with the Economic Substance of
            the Transaction ..................................................................................17

       C.   The Order Reflects Several Additional Errors of Applicable
            Law ....................................................................................................24

IX.    CONCLUSION.....................................................................................31

X.     CERTIFICATION OF COMPLIANCE FOR BRIEFS ................................33

# TABLE OF AUTHORITIES

## Cases

*Alegree v. Michael H. Clement Corp. (In re Michael H. Clement Corp.)*,

    446 B.R. 394 (N.D. Cal. 2011) ......................................................................17

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,

    465 F.3d 946 (9th Cir. 2006) ...........................................................................3

*Basin Oil Co. v. Inglewood*,

    125 Cal. App. 2d 661 (1954) ................................................................... 14, 16

*Bridges v. Cal-Pac. Leasing Co.*,

    16 Cal. App. 3d 118 (1971) ...........................................................................17

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

    68 Cal. App. 4th 445 (1998) ..........................................................................14

*City of Manhattan Beach v. Superior Court*,

    13 Cal. 4th 232 (1996) ..................................................................... 13, 16, 19

*Datalex (Ireland) Ltd. v. PSA, Inc.*,

    2003 U.S. Dist. LEXIS 27563 (C.D. Cal. Jan. 30, 2003)...............................17

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,

    109 Cal. App. 4th 944 (2003) ........................................................................14

*Frank Lyon Co. v. United States*,

    435 U.S. 561 (1978)..................................................................................18, 19

*Gallo v. S. Cal. Edison Co.,*

>2012 Cal. App. Unpub. LEXIS 8087 (Nov. 5, 2012) ....................................12

*Gamerberg v. 3000 E. 11th St., LLC,*

>44 Cal. App. 5th 424 (2020) .......................................................................11

*Golden West Baseball Co. v. City of Anaheim,*

>25 Cal. App. 4th 11 (1994) ................................................................... 12, 25

*In re Anchorage Sportsplex, Inc.,*

>462 B.R. 722 (Bankr. D. Alaska 2010)..................................................... 13, 17

*In re Kmart Corp.,*

>290 B.R. 614 (Bankr. N.D. Ill. 2003) ........................................................9, 11

*In re Lansing Clarion Ltd. P'ship,*

>132 B.R. 845 (Bankr. W.D. Mich. 1991).......................................................13

*In re Moreggia & Sons, Inc.,*

>852 F.2d 1179 (9th Cir. 1988)......................................................................17

*In re PCH Assocs.,*

>804 F.2d 193 (2d Cir. 1986)........................................................................13

*In re PG&E Corp.,*

>2020 Bankr. LEXIS 598 (Bankr. N.D. Cal. Feb. 28, 2020) ...........................9

*In re SCC Assoc. II Ltd. P'ship,*

>158 B.R. 1004 (1993) ........................................................................... 13, 19

iv

*Jorgensen v. Cassiday*,

    320 F.3d 906 (9th Cir. 2003).................................................................................3

*Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*,

    66 F.3d 1091 (9th Cir. 1995)...............................................................................17

*Mission Prod. Holdings v. Tempnology, LLC*,

    587 U.S. 370 (2019)..............................................................................................8

*NLRB v. Bildisco & Bildisco*,

    465 U.S. 51 (1984).................................................................................................9

*Oceanside Cmty. Ass'n v. Oceanside Land Co.*,

    147 Cal. App. 3d 166 (1983) ..............................................................................27

*Olson v. Cornwell*,

    134 Cal. App. 419 (1933) ....................................................................................14

*Phillips v. Doran*,

    2008 Cal. App. Unpub. LEXIS 8549 (Nov. 5, 2008) .........................................12

*Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.*,

    871 F.2d 1082 (Fed. Cir. 1989)...........................................................................11

*Qualls v. Lake Berryessa Enters.*,

    76 Cal. App. 4th 1277 (1999) ..................................................................... passim

*Richardson v. Franc*,

    233 Cal. App. 4th 744 (2015) ............................................................................12

v

*Rittmann v. Amazon.com, Inc.*,

    971 F.3d 904 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1374 (2021)................3

*Scaringe v. J.C.C. Enters., Inc.*,

    205 Cal. App. 3d 1536 (1988). ....................................................................29

*Shivkov v. Artex Risk Sols., Inc.*,

    974 F.3d 1051 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2856 (2021)..............3

*Smith v. Royal Ins. Co.*,

    111 F.2d 667 (9th Cir. 1940)........................................................................11

*Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*,

    231 Cal. App. 4th 134 (2014) ......................................................................21

*United States v. S. Cal. Edison Co.*,

    300 F. Supp. 2d 964 (E.D. Cal. 2004) .........................................................11

*Unsecured Creditors' Comm. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co.)*,

    139 F.3d 702 (9th Cir. 1998)..........................................................................8

*Water Ski Mania Estates Homeowners Ass'n v. Hayes (In re Hayes)*,

    2008 Bankr. LEXIS 4668 (B.A.P. 9th Cir. Mar. 31, 2008)...........................26

**Statutes**

11 U.S.C. § 365 ....................................................................................1, 8, 11

Cal. Civ. Code § 1468 ..................................................................... 9, 27, 28

Cal. Civ. Code § 1636 ....................................................................13

Cal. Civ. Code § 1638 ........................................................................13

Cal. Civ. Code § 1641 ........................................................................13

Cal. Civ. Code § 1643 ........................................................................13

Cal. Civ. Code § 1644 ........................................................................13

### Rules

Fed. R. Bankr. P. 8015(a)(5)(A) ........................................................33

Fed. R. Bankr. P. 8015(a)(7)(B)(i) .....................................................33

Fed. R. Bankr. P. 8015(g) ..................................................................33

### Treatises

6 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 18:5 .........................................12

## I.    INTRODUCTION

This appeal rests on a bedrock principle of contract interpretation: courts must honor the parties' expressed intent and their commercial bargain.

The bankruptcy court erred by disregarding the parties' repeated and consistent characterization of their two virtually identical agreements as licenses—an intent that aligns with the agreements' long-term, forward-looking commercial substance. By recharacterizing those contractual arrangements as conveyances of property interests, the court deprived SF Oakland Bay LLC ("SFOB"), as Chapter 11 debtor, the core protection that 11 U.S.C. § 365 is designed to provide: rejection of burdensome, ongoing commercial contracts.

The agreements repeatedly affirm a license. Throughout, the parties described their arrangement in licensing terms—using "license," "licensor," and "licensee" at least 170 times—and declaring the grant was "for a license only," and "no bailment," and thus not a property interest. That meticulously memorialized intention grounded their bargain in a licensing relationship granting licensees long-term permission to use SFOB's property to park cars.

Aligned with the repeated expressions of intent, the economic substance of their commercial bargain reflected significant and genuine attributes of a traditional license: limited grants of use, the right of SFOB to terminate the arrangement, limits on assignment, retained licensor power to reallocate usable

1

property, exclusive ownership and possession, and future contractual performance expectations tied to ongoing permissive access with periodic increase in parking fees. Those substantive features defined their commercial deal and confirmed that, in both expressed intent and economic reality, the parties structured and treated the arrangement as a license.

The bankruptcy court assumed, however, that a license cannot, as a matter of law, exist if terminable only for cause and labeled permanent or irrevocable. But California law is to the contrary. Courts recognize that in modern day contracting parties may (and often do) structure licenses with varied duration and termination provisions that depart from common law practice without altering their essential character as permissions to use rather than conveyances of a property interest.

Thus, rather than ticking off a check list, courts are directed to perform a functional, economic substance-based inquiry to discern the practical realities of the parties' commercial bargain and avoid reliance on formal constraints.

That inquiry reveals that the agreements mirror any ordinary long-term parking arrangement: the licensees paid an escalating monthly fee in exchange for the continuing right to park on SFOB's property. That fee-for-access structure depends on ongoing performance over time, confirming that the parties created a forward-looking commercial relationship—not the conveyance of a property interest—with continuous and changing economic consequences.

2

Indeed, the bankruptcy court's acknowledgement at the hearing—that denial of the motion to reject constituted a "devastating decision for the debtor economically" (ER0845:20–21)—underscored the parties' ongoing, performance-based commercial arrangement structured within a licensing framework.

The order below cannot be squared with the principles that govern contract interpretation and permitted licensing arrangements. It should be reversed to allow SFOB to reject the License Agreements.

## II.   STANDARD OF REVIEW

This appeal strictly concerns interpretation of contractual provisions and therefore presents pure questions of law reviewed *de novo*. *See Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1058 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2856 (2021)*; Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 909 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1374 (2021). The same applies to lower court application of state law. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 949 (9th Cir. 2006); *Jorgensen v. Cassiday*, 320 F.3d 906, 914 (9th Cir. 2003).

## III.   MATERIAL CONTRACT TERMS

1.  In February 1994 and October 1997, the predecessor-in-interest to SFOB entered into separate license agreements with Portside Homeowners' Association ("PHOA") (each titled, "License Agreement"). ER0085–102; 103–118. Both involve the grant of a license to use parking spaces in an enclosed garage (the

3

"Garage") in San Francisco and owned by SFOB. ER0070. PHOA manages a condominium project located on the property (the "Project"). ER0211–212.

2.  The License Agreements require that parking space users agree to its terms and provisions in writing. ER0160. The terms of each contract are substantially identical and mostly track paragraph by paragraph. *Compare* ER0140–154; 158–173. Citations to one agreement correlates with the same section for the other.

3.  Recital D of the License Agreements states that the parties "desire that Licensor grant to Licensee, for the benefit of the Licensee Property and the owners of the Condominiums (the 'Owners'), the right to park passenger cars . . . on the Licensor Property." ER0213.

4.  The opening sentence of the License Agreement provides: "Licensor hereby grants to Licensee, for the benefit of the Owners, an irrevocable license (the 'License') to park . . . Motor Vehicles in the garage (the 'Garage') located on the Licensor Property in designated spaces assigned to Licensee." ER0213.

5.  The 1994 contract covered 62 parking spaces (ER0213) and the 1997 contract 158 (ER0231). Licensees recorded the contracts in San Francisco. ER0140; 158.

6.  The parties declared in the License Agreements that they intended to create "only a license of space," and "no bailment." ER0149.

4

7. The License Agreements invoke the terms "license," "licensor," and "licensee" at least 170 times. ER0158–173.

8. Appellees offered no extrinsic evidence inconsistent with these pervasive characterizations.

9. In contrast, the License Agreements mention "easement" once in their Miscellaneous sections referring to a separate document titled "Master Declaration of Conditions, Covenants and Restrictions *Establishing Reciprocal Easements* and a Plan of Ownership for Portside, San Francisco, California" ("CC&Rs"). ER0169 (emphasis added). The CC&Rs invoke "easement" forty-one times. ER0246–306.

10. Similarly, "covenant" appears but twice in the License Agreements' substantive terms, in a Miscellaneous section. ER0168.

11. The License Agreements provide SFOB ongoing operational control over the licensed space in numerous respects. For example:

a) SFOB may allocate and reassign parking spaces at its discretion; licensees have no right to any particular space in the Garage. ER0160–161.

b) SFOB controls access, initially via valet from 7:00 a.m. to 7:00 p.m. with key-card entry otherwise, and may modify or eliminate valet service for operational reasons. ER0161.

c) SFOB may designate parking space for exclusive use by other parties, "close off" portions of the Property for maintenance and repair work and prevent

5

"acquisition of prescriptive rights" in those areas, designate an agent to operate and manage the Garage, and eject unauthorized parties from the Garage. ER0164.

d) SFOB may allow the general public to use the Garage. ER0165.

e) SFOB may, for health, safety, and comfort purposes, promulgate operating rules and regulations for Garage use. ER0165–166.

f) SFOB is empowered to "erect parking control signs" that applicable law requires to permit citation or towing of unauthorized vehicles. ER0166.

12. The License Agreements contain standard terms for long-term parking:

a) Licensees must pay a monthly fee to park in the Garage. ER0162–164.

b) Parking fees are adjusted annually based on a designated Consumer Price Index. *Id*.

c) SFOB may bar licensees from the Garage for failure to pay the requisite monthly license fee. ER0164.

d) SFOB may terminate the licenses for material breaches of the License Agreements and may exercise all legal and equitable remedies. ER0166–167.

e) On an ongoing basis, licensees must "hold" SFOB "harmless" for any "claims for liability . . . for any injury to persons or property arising out of [their] "use of or presence in the Garage." ER0165. They also agreed to an ongoing obligation to "cooperate to enforce compliance . . . with any rules or regulations

6

[that SFOB promulgates] for the use of [the spaces in which they park cars]." ER0166.

f) The licenses are "strictly limited to and for the purposes" expressed in the License Agreement. ER0166.

13. The License Agreements contain duration and termination provisions.

a) The licenses remain in effect "in perpetuity," subject, however, to termination for timely payment of rent and compliance "with the terms of the License Agreements" ER0166.

b) Similarly, the contracts label the grant as an "irrevocable license . . . on the terms and conditions contained in" the License Agreements (ER0160), which include termination provisions. They also provide that licenses "shall be appurtenant to the" condominiums, and "shall inure to the benefit of [the condominium owners]" and "shall burden and be binding upon the [condominiums] and [their] successive owners." ER0168.

c) The License Agreements bar any assignment of the License unless in connection with a sale of the fee title to a condominium. *Id*.

## IV.   PROCEDURAL HISTORY

On September 3, 2025, SFOB filed a Chapter 11 petition. ER0001–74.

On September 17, 2025, SFOB filed motions to reject the License Agreements. ER0185–188.

On October 10, 2025, after substituting counsel, SFOB withdrew the motions to reject. ER0393–398.

On November 11, 2025, SFOB refiled motions to reject the License Agreements. ER0399–462.

On November 21, 2025, PHOA filed opposition to the motions, ER0463–667, as did an entity not party to the License Agreements. ER0668–687.

On December 2, 2025, SFOB replied to the opposition. ER0688–743.

On February 12, 2026, the bankruptcy court held a hearing on the motions to reject the License Agreements. ER0800–848.

On February 19, 2026, the bankruptcy court issued an order denying the motions (the "Order"). ER0754–772.

On March 4, 2026, SFOB filed a Notice of Appeal. ER0773–795.

## V.     THE ORDER

Under 11 U.S.C. § 365, a Chapter 11 debtor may seek to reject an executory contract—one under which material performance remains due on both sides, *Unsecured Creditors' Comm. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co.)*, 139 F.3d 702, 705 (9th Cir. 1998)—and be relieved of continuing performance obligations. Such motions are routinely granted when they reflect a sound exercise of the debtor's business judgment. *Mission Prod. Holdings v. Tempnology, LLC*, 587 U.S. 370, 373 (2019). License agreements are generally

subject to rejection, *In re Kmart Corp.*, 290 B.R. 614, 618 (Bankr. N.D. Ill. 2003), whereas agreements that convey property interests are not. *In re PG&E Corp.*, 2020 Bankr. LEXIS 598, at *10 (Bankr. N.D. Cal. Feb. 28, 2020). An approved rejection is deemed a contract breach as of the petition date, giving rise to an unsecured damage claim. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 530 (1984).

After finding the License Agreements ambiguous as to the interests they conveyed (ER0765:2–3), the bankruptcy court, following a thoughtful analysis within its chosen framework, concluded they created property interests rather than licenses, a conclusion SFOB maintains constitutes legal error.

The court first held that the agreements satisfy California Civil Code § 1468 and the four-factor *Oceanside* test for covenants running with the land. In the court's view, each agreement identifies a specific parking space and the benefiting PHOA member, expressly binds successors to continue providing parking, and affects both SFOB's use and maintenance obligations and PHOA members' parking rights. The court also noted that the agreements were not terminable at will (but on curable breach) and were recorded and that their language—stating the rights are "irrevocable," "in perpetuity," and "appurtenant," binding on successors, and deemed assumed by future owners—suggested a covenant intended to run with the land. It further noted, without undertaking a specific analysis of contract terms,

9

that the agreements confer inheritable, perpetual parking rights that reflect preservation of a land interest rather than future contractual duties. ER0765–767.

The court alternatively held that, if the agreements were not covenants, they were easements. It reasoned that licenses are ordinarily revocable and personal, whereas the License Agreements are expressly irrevocable, perpetual, appurtenant to the condominium property, and binding on successors of both parties. The court viewed the right to cure breaches and the absence of a unilateral termination right (if breaches are timely cured) as evidence that the rights are "functionally" irrevocable and therefore inconsistent with a license. Although the court acknowledged that the parties repeatedly designated the agreements as licenses, it concluded that this operative language was not controlling and that the agreements evince an intent to create an inheritable interest in land. On that basis, the court held that the agreements are covenants running with the land, or, at minimum, easements. ER0768–770.

In its legal analysis, the court did not undertake any inquiry into the economic substance and commercial context of the transaction—how the arrangement functions in practice, what commercial risks and benefits were allocated, how the parties structured their *ongoing* relationship, or how the ever-present future contract performance reconciles with a conveyed property interest. Nor did the court reconcile its acceptance of the one-time property labels of

10

"irrevocable," "perpetuity," and "appurtenant" with the express grant of "only a license" and at least 170 references to "license" or its variations. Nor did the court engage in application of governing contract interpretation principles.

Finally, because the bankruptcy court determined that the License Agreements did not grant licenses and thus were not subject to 11 U.S.C. § 365, it did not address whether the agreements satisfied the executory contract requirements, including application of SFOB's business judgment. ER0770–771.

## VI.   GOVERNING LICENSE LAW

Ordinary principles of state contract law govern license agreements. *Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989). California courts define a license as "an authority to do a particular act, or series of acts, on another's land, without possessing any estate therein." *Smith v. Royal Ins. Co.*, 111 F.2d 667, 670 (9th Cir. 1940) (citations omitted).

Licenses do not differ from common law contracts. *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 987 (E.D. Cal. 2004). "A license agreement can impose any number of on-going performance obligations on the parties, including responsibilities relating to reporting, labeling, policing, service, maintenance, and technological upgrades." *Kmart Corp.*, 290 B.R. at 618. Unlike covenants that run with the land and easements, a license is a personal right and confers no interest in land. *Gamerberg v. 3000 E. 11th St., LLC*, 44 Cal. App. 5th 424, 429 (2020). A

11

license merely makes lawful an act that otherwise would constitute a trespass. *Richardson v. Franc*, 233 Cal. App. 4th 744, 758–59 (2015).

Critically, and contrary to the bankruptcy court's key assumption, California law is clear that a contractual grant of use denominated as "irrevocable" may still constitute a license. *See Gallo v. S. Cal. Edison Co.,* 2012 Cal. App. Unpub. LEXIS 8087, at *18 (Nov. 5, 2012) (parties may contractually grant rights exceeding those available at common law, including an irrevocable license); *Phillips v. Doran*, 2008 Cal. App. Unpub. LEXIS 8549, at *5–10 (Nov. 5, 2008) (license properly both "irrevocable" and "permanent" as a matter of contract, not equity); *Qualls v. Lake Berryessa Enters.*, 76 Cal. App. 4th 1277, 1284–85 (1999) (contract enforceable as an irrevocable license not a lease); *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 36 (1994) (recognizing license as "irrevocable").

It is also settled, contrary to a key assumption of the court below, that a license may be terminable only upon specified conditions rather than at will. *See* 6 Miller & Starr, *Cal. Real Estate* (2d ed. 1989) § 18:5 at 13; *Qualls*, 78 Cal. App. 4th at 1284–85; *Golden West*, 25 Cal. App. 4th at 36.

## VII.   APPLICABLE CONTRACT INTERPRETATION PRINCIPLES

In California, the intention of the parties is the "ultimate interpretive touchstone" in construing a contract. *City of Manhattan Beach v. Superior Court*,

12

13 Cal. 4th 232, 243 (1996). *See also In re SCC Assoc. II Ltd. P'ship*, 158 B.R. 1004, 1010 (1993) ("paramount consideration"); Cal. Civ. Code § 1636. California law also requires that contracts be read as a whole, to give effect to each provision and avoid interpretations that render language surplusage. *Id*. § 1641. The interpretative goal is to discern mutual intent from the writing itself. *Id*. § 1636. Words are understood in their ordinary and popular sense unless the parties clearly use them differently. *Id*. § 1644. And contracts must be interpreted as lawful, operative, and reasonable if possible. *Id*. § 1643. At bottom, the "language of a contract" governs its interpretation. *Id*. § 1638. *See also City of Manhattan Beach*, 13 Cal. 4th at 235 (contract language if clear defines parties' intent).

Because of the paramount importance of contract language, the parties' chosen characterizations—while not dispositive—create a *presumption* regarding the true nature of their arrangement and, absent compelling evidence to the contrary, should be respected. *E.g.*, *In re PCH Assocs.*, 804 F.2d 193, 200 (2d Cir. 1986) ("strong presumption" that contract is what it purports to be); *In re Anchorage Sportsplex, Inc.*, 462 B.R. 722, 734 (Bankr. D. Alaska 2010) (party denominations presumed accurate absent compelling contrary factors); *In re Lansing Clarion Ltd. P'ship*, 132 B.R. 845, 850 (Bankr. W.D. Mich. 1991) (same).

Further, interpretations that negate contract language or render it inoperative are disfavored. *City of Atascadero v. Merrill Lynch, Pierce, Fenner &*

13

*Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998); *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 957 (2003).

Finally, contractual language need not be perfectly consistent or technically precise; if the agreement as a whole evidences an intent to grant defined rights of use, courts should honor that intent notwithstanding imprecise or inapt terminology. *Basin Oil Co. v. Inglewood*, 125 Cal. App. 2d 661, 663 (1954); *Olson v. Cornwell*, 134 Cal. App. 419, 427 (1933).

## VIII.  LEGAL ARGUMENT

### A. The Contract Language Confirms the Grant of a License

The contractual language leaves no doubt about the grant the parties intended to create. Their use of the term "license" or a variation at least 170 times constitutes an undeniable shared understanding.

The agreements reaffirm that shared understanding by declaring that the grant is "only a license of space," not a bailment. ER0149. That disclaimer reflects a deliberate drafting choice. The parties had the full range of property terminology available, yet chose to describe the grant as "only a license of space" and disclaim any bailment. The disclaimer reinforces the overall structure of the agreements: permission-based use without transfer of a property interest.

14

Appellees' theory that the express grant of a "license" should be read to mean a property interest instead requires the Court to accept an implausible premise: that the parties were mutually mistaken each time they employed the term "license" throughout the agreements, yet somehow spoke with perfect precision when the CC&Rs used the word "easement" over forty times. That is not a neutral interpretive exercise; it is a wholesale reformation of the parties' chosen language.

The theory proves far too much. It asks the Court to assume a pervasive and repeated drafting error in one set of documents, while simultaneously treating the terminology in another as infallible.

Contract interpretation does not proceed on the assumption that sophisticated parties repeatedly misdescribed the very rights they were creating. If appellee were correct, the Court would have to conclude the parties systematically and consistently used the wrong legal vocabulary across multiple agreements without once correcting the supposed mistake. That is not a reasonable inference; it is speculation untethered from the text.

The far more sensible conclusion is the obvious one: the parties said what they meant and meant what they said. Their repeated, deliberate use of licensing terminology reflects a consistent drafting choice and a coherent transactional structure. When parties return to the same characterization dozens of times across

15

related agreements, that repetition demonstrates a shared understanding of the nature of the rights granted and relationship created.

Appellees' position also creates a deeper doctrinal problem. If the parties' express language can be disregarded so readily, then the interpretive process becomes detached from the evidence contract law treats as primary in determining the intent of the parties. As noted, courts do not lightly discard the parties' own words, especially where they are unambiguous, consistent, pervasive, and uncontradicted by extrinsic evidence. To do so would invert the hierarchy of interpretive tools, elevating after-the-fact litigation positions above the contemporaneous expressions of intent.

The flipside is significant too. The parties consciously elected not to use "easement" or other property labels to describe the nature of their contract. *E.g.*, *City of Manhattan Beach*, 13 Cal. 4th at 245 ("cannot overlook the fact that if the grantors really intended to convey only an easement, they could have easily so expressed that purpose"); *Basin Oil*, 125 Cal. App. 2d at 666 (same).

To be sure, party descriptors are not dispositive in isolation; courts must examine the transaction's objective economic realities. But that principle does not diminish the force of the parties' chosen terminology—it simply sets the stage for the next step in the analysis. As SFOB shows, when the parties' repeated

16

characterizations are borne out by the structure and substance of the bargain, the law gives that operative language full effect.

**B. The Contract Language Aligns with the Economic Substance of the Transaction**

The next inquiry is whether the transaction's economic substance aligns with the expressed intent. When the drafting evidence and the economic substance point in the same direction, the characterization question is resolved. *E.g.*, *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1095 (9th Cir. 1995) (characterization questions resolved by looking at "economic realities" of the commercial bargain); *In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 1182–83 (9th Cir. 1988) (court must look to "economic substance" of agreement to determine its nature); *Alegree v. Michael H. Clement Corp. (In re Michael H. Clement Corp.)*, 446 B.R. 394, 402–03 (N.D. Cal. 2011) (court properly looked to "economic substance" to determine whether putative lease was a true lease); *Datalex (Ireland) Ltd. v. PSA, Inc.*, 2003 U.S. Dist. LEXIS 27563, at *6–7 (C.D. Cal. Jan. 30, 2003) (economic realities determine whether transaction was a sale, a lease, or a license). *Anchorage Sportsplex*, 462 B.R. at 727 (same). *See also Bridges v. Cal-Pac. Leasing Co.*, 16 Cal. App. 3d 118, 127 (1971) ("lease" label disregarded in favor of transaction's contrary "economic substance").

17

The U.S. Supreme Court decision in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), illustrates the contract interpretation principle that aligns the parties' chosen form of agreement with the transaction's economic substance.

The taxpayer (Lyon) sought to deduct expenses as the owner of property arising from a transaction the parties characterized as a sale-leaseback with long-term rental payments. The Tax Commissioner disallowed the deductions. The District Court ruled for the taxpayer, the Eighth Circuit reversed, and the Supreme Court reinstated the District Court's judgment. *Id*. at 568–72.

The circumstances involved a local bank (Worthen) that wished to construct a new facility but became stymied when available financing ran afoul of regulatory limits. To avoid those constraints, Worthen sold the property to Lyon and leased it back. Lyon then claimed ownership tax deductions, which the Commissioner denied on the basis that the substance of the deal, notwithstanding how the parties described the transaction, was a financing not a lease transaction. *Id*. at 562–68.

Worthen and Lyon memorialized the transaction in three agreements: a sale agreement, a ground lease, and a building lease. The leases contained customary provisions, including rent obligations. They also vested substantial control of the property in Worthen, entitled Worthen to inverse condemnation proceeds, and granted Worthen an option to repurchase the property. *Id*. at 565.

18

Before accepting the parties' descriptions, the Court examined the transaction's "objective economic realities," *id*. at 572–73, noting "[t]here is no simple device available to peel away the form of this transaction and to reveal its substance." *Id*. at 576. *See also City of Manhattan Beach*, 13 Cal. 4th at 243 (each contract "sui generis, no bright-line rules of construction are available").

The court weighed several contract features, including the considerations that led both the Commissioner and the Eighth Circuit to their conclusions.

Ultimately, the Court concluded that the agreements contained economic features that coincided with the parties' characterization of their deal as a leaseback transaction, and that this alignment between form and substance controlled.

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, *so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes*. What those attributes are in any particular case will necessarily depend upon its facts.

*Frank Lyon Co.*, 435 U.S. at 583–84 (emphasis added). *See also SCC Assoc. II Ltd. P'ship*, 158 B.R. 1004 (California law requires that contractual characterizations be honored when consistent with agreement's economic substance).

The parties' characterization of the License Agreements aligns with the economic substance of their bargain and should be enforced as what they are: a contractual grant of ongoing permission to use a managed parking facility.

The arrangement's operational features are unmistakably contractual and service-based. The licensor retains ongoing control of the Garage and space allocation; no licensee is guaranteed a specific stall; and spaces may be reassigned as needed. That flexibility is incompatible with a fixed property interest, which ordinarily confers a stable, identifiable right to a defined portion of land. What is granted instead is participation in a managed parking system dependent on SFOB's continued oversight and centralized control.

The economic structure reinforces the same conclusion. Licensees pay a monthly fee that adjusts with inflation. This recurring payment reflects a continuing exchange of performance: payment in return for ongoing permission and management. The presence of a fee structure escalating with CPI is strong indicia of a commercial service relationship priced with the expectation that its value will change over time. That is the hallmark of a contractual access arrangement, not a one-time transfer of a durable interest in land. The right exists only within the continuing relationship the contract creates. *Cf. DAK Indus.*, 66 F.3d at 1095 (lump-sum payment pointed to sale rather than license); *Datalex*, 2003 U.S. Dist. LEXIS 27563, at *6–7 (fee structure a key indicator of economic

20

substance). Easements, by contrast, are typically conveyed through one-time grants supported by lump-sum consideration, with periodic charges (if any) tied to the property interest as an appurtenance. *See Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134, 171–72 (2014).

What is more, the Garage operates under a valet system that allows SFOB to park and retrieve vehicles wherever space is available. That arrangement is the quintessential feature of a service license: use depends on the operator's ongoing discretion and performance, not on any fixed, identifiable portion of real property. A covenant or easement burdens land in a defined, ascertainable way; a valet service, by contrast, is a continuing operational undertaking, the antithesis of a property servitude.

The termination and assignment provisions confirm the point. The agreement is terminable for breach, and the right cannot be freely assigned except when the condominium unit is sold. These limitations preserve control over who participates in the parking arrangement and under what conditions. Such restrictions are typical of contractual permissions and difficult to reconcile with freely transferable property interests.

The remedial structure of the License Agreements further confirms their contractual character. They provide for termination upon material breach after notice and cure, cumulative remedies "at law or in equity," and mandatory

21

arbitration. ER0111–112. These are hallmarks of commercial service contracts that allocate risk and define performance and exit through negotiated terms. By contrast, traditional servitudes such as easements and covenants running with the land are not terminable upon breach or subject to unilateral extinguishment; they are durable property interests enforced to protect a continuing burden on land. The negotiated right to terminate upon default confirms a contractual relationship governed by contract remedies, not a permanent property encumbrance.

The few isolated property-sounding terms do not change that result. References to "perpetuity," "irrevocable," "appurtenant," recordation, and transfer with the sale of a condominium serve a practical purpose: preserving stability and marketability for unit owners while the contractual relationship remains in good standing, and ensuring that condominium units and the Garage can change hands without the practical and economic burden of negotiating a new license with each transfer. These provisions make the license durable and transferable with the unit; they do not transform its underlying nature. A long-term, recordable contractual right remains a license where the licensor, as here, retains operational control and the economics remain contractual. *Golden West*, 25 Cal. App. 4th at 36 (courts should not "pigeonhole" modern commercial arrangements into traditional property categories—an exercise of "little practical purpose").

22

At its most practical level, the grant mirrors commonplace arrangements repeated each day in urban and suburban communities: a property owner allowing others to park vehicles on its property while retaining possession and control. Office and commercial buildings, entertainment venues, corporate campuses, mixed-use towers, medical facilities, shopping centers (for anchor tenants), and apartments, for example, operate the same way. The same practical reality applies in a condominium building with a shared garage. Residents receive the valuable benefit of parking, but the garage remains a centrally managed, integrated facility that must be maintained and adapted over time.

Notably, in demonstrating its business judgment in seeking contract rejection, SFOB explained how rejection would permit market-rate parking and "generate $48,600 per month in additional revenue, restore the garage to modest profitability, and allow a significant payout to unsecured creditors." ER0081–82. That confirmed the agreements' real-world function: to regulate SFOB's ongoing operations and future revenue stream, a forward-looking, performance-dependent economic reality, the hallmark of a license, not a conveyance of a property interest.

The bankruptcy court's error is that it never reduced the transaction to this commercial core. Once the bells and whistles are removed, the agreement functions as a straightforward long-term parking arrangement. The court did not frame the question in those terms, did not analyze the mechanics of the

arrangement as a unified system, and did not reconcile the parties' repeated description of their relationship with the way the contract operates and its ongoing commercial nature. The court never confronted the central reality that the agreement functions no differently than any other long-term contract that permits parking in a managed facility.

Because the court failed to analyze the agreement through the lens of its commercial substance, its conclusion rests on an incomplete and legally insufficient conclusion and should be reversed.

## C. The Order Reflects Several Additional Errors of Applicable Law

Apart from not addressing the interplay between the parties' express characterizations of their rights and legal status and the economic substance of their commercial arrangement, the Order reflects several additional legal errors.

First, the court relied on two flawed legal assumptions: that a license cannot be "irrevocable" and "permanent" and terminable only for cause. ER 762:7–9.

As a threshold matter, because the License Agreements permit termination upon material breach, they are not truly irrevocable or perpetual in effect. A grant that can be lost in that manner is, by definition, revocable and not perpetual. In any event, the court's assumptions were contrary to settled California law.

Consider *Qualls v. Lake Berryessa Enters., Inc.*, 76 Cal. App. 4th 1277 (1999). There, a dispute arose over the use of federal land for mobile home

24

parking, specifically whether the plaintiff's contractual right to occupy a designated space constituted a lease, a license, or some other interest. The plaintiff argued that because its agreement was not terminable at will, it constituted a lease as a matter of law. The court rejected that contention, explaining that the issue was "easily answered": "[t]he fact that the license is not terminable at will or is coupled with an interest does not destroy its character as a license or convert it into a lease." *Id*. at 1284.

In discerning mutual party intent, the *Qualls* court emphasized that the rights and obligations at issue could not be properly understood through rigid common law categories, but instead required attention to "modern commercial realities . . . without regard to its classification under traditional common law concepts," reasoning in a manner applicable here.

> We believe this is a sound observation and in accordance with the increasing creativity of contracts that blur the distinctions between interests. In other words, the contract between the parties may contain terms that give greater rights to a contracting party than would be accorded by the common law, such as, for example, an irrevocable license or the incorporation of specific terms relating to termination.

*Id*. at 1285. The court thus held that the contract under scrutiny more resembled an "irrevocable license" than an easement or leasehold. *Id*. at 1284–85. *See also Golden West*, 25 Cal. App. 4th at 35–36 (licenses can be both irrevocable and terminable other than at will).

*Qualls* and *Golden West* (and the other cited cases) underscore the bankruptcy court's erroneous premise that traditional labels and categories control over the parties' expressed intent and the economic reality of their arrangement. *Qualls* recognizes that modern commercial agreements may intentionally "blur the distinctions" among common law forms and may include terms—such as "irrevocable" or tailored termination provisions—that expand or reshape rights beyond rigid doctrinal classifications. 76 Cal. App. 4th at 1284–85. Properly understood, these decisions reject precisely the sort of formalistic reasoning employed here and instead require courts to honor the parties' chosen allocation of rights and risks, even if they do not fit neatly within traditional property categories.

Second, the court misapplied the "primary-nature" test of *Water Ski Mania Estates Homeowners Ass'n v. Hayes (In re Hayes)*, 2008 Bankr. LEXIS 4668, at \*31–32 (B.A.P. 9th Cir. Mar. 31, 2008). Invoking the "primary nature" test, the court concluded that because "the License Agreements provide inheritable, irrevocable, and perpetual parking rights . . . their primary nature is 'preservation of a land interest, not future duties in contract.'" ER0767. That conclusion as shown above rests upon false assumptions about the irrevocable and perpetual nature of the licenses. It also misconstrues the contracts.

The License Agreements' primary nature is, almost entirely, future executory contractual duties. Paragraph 2 governs future space allocation and access.

26

Paragraph 3 governs future fee payment, including inflation adjustments. Paragraph 4 governs future operational decisions by SFOB, including designation of third-party uses and maintenance closures. Paragraph 5 governs future indemnification and liability allocations. Paragraph 6 governs future promulgation of operating rules. Paragraph 9(a) governs future breach-based termination procedures. Paragraph 9(c) governs future dispute resolution through arbitration. Paragraph 10(a) governs future cooperation on use monitoring. ER0231–241.

No land interest is "preserved" as a servitude. The License Agreements do not protect any aesthetic, architectural, environmental, or use-based features of the property. They do not impose any obligation to maintain the Garage in a particular physical condition. Its subject matter is the *operation of a commercial parking business*, not the preservation of any quality of the Licensor Property as land. Under the primary-nature test, the License Agreements are properly understood as nothing more than a contractual grant of a license.

Third, the court erred in relying on *Oceanside Cmty. Ass'n v. Oceanside Land Co.*, 147 Cal. App. 3d 166, 174 n.4 (1983), which applied the four-factor test for covenants running with the land codified in California Civil Code § 1468.

Applying the correct analytical framework—under which contract language evidencing mutual intent to create licenses aligns with the transaction's economic substance—the License Agreements are what they say they are: grants of licenses,

27

rendering the *Oceanside* factors inapplicable. Even so, the bankruptcy court misapplied at least two of the factors.

The first factor requires that the contractual grant benefit and burden "particularly described" property. Cal. Civ. Code § 1468. The bankruptcy court read the License Agreements to satisfy this factor because "each License granted under the agreements identifies both the specific parking space by lot and the precise PHOA member receiving the benefit of that parking space." ER0765. That misreads the contracts. The reference to specific "lot" descriptions is to the *condominium units*. The agreements, in contrast, do *not* identify any specific space by lot for parking or a defined set aside portion of the Garage as burdened. They reference only the overall *parcel* that SFOB owns. ER0103. Indeed, the Addendum that each condominium must sign for the privilege of parking in the Garage does not contain any reference to a specific lot or space in the Garage. ER0101; 117.

More importantly, the agreements expressly permit SFOB to revoke, reassign, and reconfigure space assignments in its sole discretion. That is, the agreements reference only the master parcel while the supposed burden—parking use—floats within it. No metes and bounds, lot number, easement area, or recorded exhibit ties the obligation to any defined portion of land, and the licensor may move and reconfigure spaces at will. Because the allegedly burdened property is not fixed, ascertainable, or particularly described, the agreements cannot create a

28

covenant running with the land. A covenant runs with land only when the burden attaches to "particularly described" piece of real property. *Scaringe v. J.C.C. Enters., Inc.*, 205 Cal. App. 3d 1536, 1544 (1988).

The absence of that description and the agreed-upon ongoing power of reallocation means the agreements create a permission to use whatever parking configuration SFOB chooses to provide at any given time. That is the hallmark of a license, not a covenant running with the land.

The third *Oceanside* factor requires that the covenant "concern the use, repair, maintenance, or improvement of the property or the payment of taxes and assessments." ER0761:24–762:1. The Bankruptcy Court addressed this factor only conclusorily, stating that the License Agreements "touch and concern the Garage because they affect both Debtor's ownership of the Garage and PHOA's use of the Garage." ER0766:4–8. That reasoning is flawed: if affecting how an owner performs services at a site sufficed, every location-based commercial contract— leases, management agreements, concession contracts—would qualify as a covenant running with the land. The touch-and-concern requirement exists to distinguish true land-based restrictions from agreements merely performed on land, and these agreements do not restrict the property's core use as a parking facility serving condominium owners and the public on a fluctuating allocation of spaces.

29

Yet the bankruptcy court effectively inferred a land-use restriction from the mere fact the agreements are performed at the Garage, even though the agreements contain no express limitation on SFOB's use of the property. SFOB remains free to use the Garage for what it is designed: a managed parking facility. The agreements do not limit that use nor SFOB's ability to develop, improve, or repurpose portions of the Garage not in active use by licensees.

Fourth, the bankruptcy court misapplied easement law.

The Order defines an easement as creating a "nonpossessory right to enter and use land in another's possession *and obligates the possessor not to interfere with the uses authorized by the easement*." ER0762:6–9 (emphasis added). The License Agreements do the opposite: they authorize SFOB to engage in extensive interference with use of parking spaces. SFOB may reassign parking spaces at its discretion; designate portions of the Garage for the exclusive use of third parties; may close off portions of the Garage for maintenance and repair; allow the general public to use the Garage; and promulgate operating rules governing the permitted use, including rules restricting use of parking spaces for anything other than parking a vehicle. These provisions describe extensive and ongoing operational control over the use rights licensees assert. The provisions do not support a creation of an easement.

30

Fifth, the bankruptcy court placed unwarranted weight on the reference to "appurtenant," particularly where that language is readily consistent with a license. Read in context with the assignment restrictions, "appurtenant" describes the administrative relationship between the parking rights and condominium ownership: the license cannot be held independently of fee ownership and passes automatically with the transfer of condominium units. It confirms that PHOA, as a separate legal entity, holds no freestanding right divorced from the units; that individual owners cannot separately transfer parking privileges; and that purchasers acquire whatever parking access exists as part of the condominium package, without any separate conveyance from SFOB as licensor.

As *Qualls* recognized, easements and licenses "may, but need not, have definite boundaries other than the boundaries of the servient tenements themselves." 76 Cal. App. 4th at 1285 (citation omitted). The mere fact that a license is tied to ownership of a particular property interest does not transform it into a covenant or easement. It simply reflects how the contractual permission is allocated and transferred. Here, "appurtenant" functions as a rule of contractual administration, not a grant of a property estate.

## IX.    CONCLUSION

Commercial parties often structure long-term, exclusive arrangements that resemble leases or easements that may last for decades, be effectively perpetual, or

31

limit termination to defined "cause." But those features do not convert a contract into a property estate. They are market tools parties use to stabilize expectations, allocate risk, and support investment in contractual relationships.

Courts must first ask what the agreement was designed to create. Where an instrument repeatedly uses "license," reserves extensive dominion in the grantor, frames use as permission-based, and is designed for ongoing, long-term economic effect, it reflects an intent to remain in contract, not convey real property.

Treating those common contractual features as dispositive property indicators collapses party choice into judicial recharacterization. Respecting the parties' consistent license framework honors freedom of contract.

Because contractual text and economic substance align, the Court should reverse the Order and permit rejection of the License Agreements.

Dated: May 15, 2026                    FINESTONE HAYES LLP


                              By: /s/ *Michael J. Coffino*
                                  Michael J. Coffino
                                  Attorneys for Appellant
                                  SF OAKLAND BAY LLC

## X.    CERTIFICATION OF COMPLIANCE FOR BRIEFS

**No.:**        3:26-cv-02590-JD

**Debtor:**    SF OAKLAND BAY LLC

The undersigned certifies that this brief contains 6,945 words, excluding the items exempted by Federal Rule of Bankruptcy Procedure 8015(g). This brief complies with the word limit of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i). The type size and typeface comply with Federal Rule of Bankruptcy Procedure 8015(a)(5)(A).

Dated: May 15, 2026                              FINESTONE HAYES LLP


                                        By: */s/ Michael J. Coffino*
                                             Michael J. Coffino
                                             Attorneys for Appellant
                                             SF OAKLAND BAY LLC